720 P.2d 87

TRIANGLE CONSTRUCTION, A DIVISION OF BENTLEY–DILLE GRADALL RENTALS, INC., an Arizona corporation, Plaintiff-Appellant, Cross Appellee,

v.

CITY OF PHOENIX, Defendant-Appellee, Cross Appellant.

No. 1 CA–CIV 7393.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 1, 1985.

Reconsideration Denied Feb. 11, 1986.

Review Denied June 10, 1986.

Robinson & Syme by James J. Syme, Jr., Glendale, for plaintiff-appellant, cross appellee.

Andy Baumert, City Atty. by Jesse W. Sears, Phoenix, for defendant-appellee, cross appellant.

## OPINION

JACOBSON, Judge.

This appeal involves the interpretation of a written contract between the City of Phoenix and Triangle Construction, a division of Bentley-Dille Gradall Rentals, Inc. (Triangle). The issues which we must determine are: (1) whether Triangle was entitled to payment for equipment standby time in excess of eight hours per day and on Saturdays, Sundays and holidays, (2) whether there was evidence to support the trial court's determination that Triangle should be paid a 90% equipment rental rate for equipment operating in excess of 352 hours, and (3) whether standby time was payable for ripper attachments on bulldozers.

These issues arise out of the following fact situation. Due to heavy rainfall in the spring of 1980, the Salt River Project released water from its reservoirs into the Salt and Verde Rivers. Damage caused by the water resulted in a declaration of a state of emergency by the City of Phoenix and the Governor of Arizona. The water caused a break in a multi-city sewer line which was located in the river bottom of the Salt River near 40th Street in Phoenix. The City of Phoenix, as agent for the three cities who jointly owned the sewer line, contracted with Triangle to perform emergency repair to the broken line. During the course of repair, it was discovered that another part of the same sewer line was blocked and the contract was amended to include repair of this additional damage.

After completion of the contract, a dispute arose as to what amounts were payable to Triangle under the terms of the contract. Triangle filed suit on September 4, 1981 seeking additional compensation. The City filed an answer and asserted a counterclaim alleging that Triangle had been overpaid due to billing errors for duplicate privilege taxes and materials invoices, and for excess standby time on equipment.

Trial was held to the court and on May 4, 1983, judgment was entered for Triangle on its claim for additional money for equipment operating over 352 hours, and for standby time for rippers. Judgment was entered for the City of Phoenix on its counterclaim for reimbursement of certain duplicate payments and for payment of excess standby time. The result was a net judgment of $63,718.28 in favor of the City.

Triangle filed an appeal from that portion of the judgment which grants the City of Phoenix reimbursement of money paid for standby time. The City filed a cross-appeal from those portions of the judgment awarding 90% of the full rental rate for equipment operating over 352 hours and granting payment for ripper standby time.

We address first the subject of Triangle's appeal.

## STANDBY TIME

Triangle argues that the contract is ambiguous with respect to payment for standby time in excess of eight hours per day and on Saturdays, Sundays and holidays. It next contends that parol evidence, which was admissible in light of that ambiguity, supports a conclusion that it was entitled to such payment.

It is unclear whether the trial court concluded that the contract was unambiguous with respect to payment for standby time or found that parol evidence supported the City's interpretation. However, interpretation of a contract is a question of law to be determined by an appellate court independently of the trial court. *See Abrams v. Horizon Corp.*, 137 Ariz. 73, 78, 669 P.2d 51, 56 (1983); *Huskie v. Ames Brothers Motor and Supply Co.*, 139 Ariz. 396, 401, 678 P.2d 977, 982 (App.1984).

Triangle and the City of Phoenix entered into a contract which incorporated various

documents including the call for bids, the contractor's proposal, the Maricopa Association of Governments Uniform Standard Specifications for Public Works Construction (MAG Specs), the Arizona Department of Transportion Schedule of Equipment Rental Rates for Force Account Work dated June 1, 1979 (ADOT Schedule), special conditions, and other documents identified in the MAG Specs as part of the contract. The following contract provisions addressed payment for standby equipment:

Special Condition—Project No.
S–80059.00, Paragraph 5
Definitions:

c. EQUIPMENT: For other than small tools and manual equipment, the use of which has been authorized by the Engineer, the Contractor will be paid in accordance with the latest approved schedule of Equipment Rental Rates of the Arizona Highway Department (February 1977), unless another rate is agreed upon, in writing, before the work is started, except that only equipment hours actually expended on the job site will be reimbursed. The City will not pay transportation costs or move-in, move-out costs.

ADOT Schedule, Page 2, Paragraph 2

Equipment that is in operational condition and is standing by with the engineer's approval for participation in Force Account Work will be paid for at 50 percent of the agreed upon rental rate.

ADOT Schedule, Page 4, Paragraph 3

The rental time to be paid per day shall not exceed eight hours unless the equipment is in operation longer than eight hours.

ADOT Schedule, Page 5, Paragraph 4

The rental period shall begin at the time the equipment is unloaded at the site of the Force Account Work and shall continue exclusive of Saturdays, Sundays, Holidays (unless the equipment is in operation on these days on Force Account Work) and shall terminate at the time the engineer directs the contractor to discontinue the use of the equipment. The rental time to be paid per day shall be eight hours unless the equipment is in operation longer than eight hours....

Triangle first contends that the above quoted provisions of the ADOT schedule are ambiguous because the word "operation" could include "standby." It also argues that ADOT schedule, page 5, paragraph 4, could mean that as long as *any* equipment is actually operating, rental time can be paid for all other equipment which is on standby. We disagree.

■ Initially, we note that a contract is not ambiguous just because the parties disagree as to its meaning. *Phillips v. Flowing Wells Unified School Dist. No. 8 of Pima County*, 137 Ariz. 192, 193, 669 P.2d 969, 970 (App.1983). Language used in a contract is ambiguous only when it can *reasonably* be construed to have more than one meaning. *Id.* Rules of interpretation which are properly utilized in determining the intent of the parties to a contract include rules relating to giving words their ordinary meaning, giving technical terms their technical meaning, reading the contract as a whole, giving effect to the main purpose of the instrument and interpreting the contract so as to make it effective and reasonable. *See Phelps Dodge Corp. v. Brown*, 112 Ariz. 179, 181, 540 P.2d 651, 653 (1975).

■ No evidence was introduced at the trial to indicate that the term "operation" had a special technical meaning other than its ordinary meaning of "performing work" or "functioning." *See Webster's Third New International Dictionary* (1969). The above quoted contract provisions distinguish between equipment that is in "operational condition"—i.e., capable of being used—and equipment which is "in operation"—i.e., being used.

Paragraph 3 on page 4 and paragraph 4 on page 5 of the ADOT Schedule refer to "in operation" as a condition which will permit rental payments to exceed eight hours per day. Paragraph 2 of page 2 of

the ADOT Schedule specifically provides for a different rental rate for equipment which is "in operational condition" and is "standing by." We conclude that the only reasonable interpretation of these paragraphs is that equipment which is "in operation" was not intended to encompass standby equipment.

We likewise reject Triangle's contention that paragraph 4 of page 5 can reasonably be interpreted to mean that if any equipment is operating, rental time can be paid for any standby equipment for more than eight hours or on Saturdays, Sundays and holidays. This paragraph provides that a rental period begins at the time "the equipment" is unloaded at the site of the force account and continues exclusive of Saturdays, Sundays and holidays "unless *the equipment* is in operation on these days." In a construction job where various pieces of equipment may be brought in at different times to the site, the only reasonable construction of this provision is that rental for each particular piece of equipment begins at the time that it is unloaded and continues exclusive of Saturdays, Sundays and holidays until the contractor discontinues the use of that equipment.

Triangle's interpretation is that "the equipment" in the last sentence of paragraph 4 does not refer to "the equipment" in the preceding sentence. Rather, it means "any equipment". This interpretation would require standby payments for all rental equipment for more than eight hours and on Saturdays and Sundays if even one piece of equipment is operating at that time. We conclude that the only reasonable construction of paragraph 4 is that "the equipment" has the same meaning throughout the paragraph and refers to individual pieces of equipment. Rental for that equipment is based on eight hours per day on Mondays through Fridays excluding holidays unless that particular equipment is "in operation" on Saturdays, Sundays and holidays or longer than eight hours.

Accordingly, we conclude that the trial court correctly determined that Triangle had been overpaid by the City of Phoenix for standby time during the excluded periods.

As a general rule, a public body can recover funds paid out by mistake. *See Maricopa County v. Cities & Towns of Avondale, etc.*, 12 Ariz.App. 109, 112, 467 P.2d 949, 952 (1970). Further, under the terms of the contract in question, the City reserved the right to correct any error which was discovered after payment to the contractor. We therefore affirm that portion of the judgment awarding the City of Phoenix $115,633.58 for overpayment to Triangle.

We turn next to the City's arguments on cross-appeal.

### REASONABLE RENTAL FOR EQUIPMENT OPERATING IN EXCESS OF 352 HOURS

The contract incorporated the ADOT Schedule of Rates for various pieces of equipment and further provided that during the first 80 hours of operation the full rental rate would be paid for the equipment; from 81 to 352 hours, the applicable rate would be 90% of the scheduled full rental rate; and rates beyond 352 hours of operation would be "subject to negotiation."

The parties failed to negotiate a mutually acceptable payment for equipment used in excess of 352 hours. The City determined that 80% was reasonable and Triangle contended that 90% should have been paid. The City paid Triangle at an 80% rate and Triangle sought to recover the difference between the 80% rate and the 90% rate.

At trial, Triangle took the position that the contract required the parties to negotiate a rental rate before a piece of equipment reached 352 hours. Further, it contended that the City had a duty to initiate such negotiations. Triangle urged that since the City had not initiated the negotiations until after 352 hours had accrued on various equipment, the 90% rate should continue. It argued that the burden was on the party seeking to change the rate to

come forward and initiate negotiations rather than wait until the equipment accumulated substantial hours above 352. Triangle has cited no authority for this proposition and we have found none.

■ Where a contract price is left to future agreement by the parties and they fail to agree, the price is a reasonable one. *See Restatement (Second) of Contracts* § 33, comment e and illustration 8 (1981). This would be the appropriate price whether we view the contract as one having an indefinite term which can be supplied or conclude that there was no contract and base recovery on a quantum meruit theory. *Compare Pyeatte v. Pyeatte*, 135 Ariz. 346, 661 P.2d 196 (App.1982); *Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 617 P.2d 767 (App.1980) (finding that absence of price precluded formation of a contract) *with Restatement (Second) of Contracts* § 33 (1981).

■ The trial court concluded that 90% of the scheduled rental rate was reasonable compensation for the work performed by Triangle. We must view the evidence and reasonable inferences therefrom in the light most favorable to Triangle and if there is any evidence to support the judgment of the trial court, it must be affirmed. *Paul Schoonover, Inc. v. Ram Constr., Inc.*, 129 Ariz. 204, 205, 630 P.2d 27, 28 (1981).

■ The record reflects that when Triangle and the City of Phoenix attempted to negotiate this matter, the City suggested 80% of the full operating rate as reasonable compensation and Triangle contended that 90% was reasonable. The City requested Triangle to provide some documentation for their position. Specifically, it asked for data relative to the operating and ownership costs of the equipment. Triangle failed to submit materials in support of its demand. The only evidence in the record to which Triangle refers as a basis for the trial court's award was the testimony of Robert L. Bentley, the vice president of Bentley-Dille Gradall Rentals, Inc. Mr. Bentley testified as follows:

Q. [By Mr. Syme] My question was, did he ask you at that time whether any of your equipment had worked over 352 hours[?]

A: No. He was aware of it.

Q. And what did he say with respect to equipment that had worked over 352 hours?

A. That we should negotiate a figure.

Q. And what did you say to him?

A. That we thought that the 90 percent was fair.

Q. And was it your understanding that the 90 percent figure was to continue for hours beyond 352?

A. Yes, that's correct.

Q. And did he suggest some alternate figure other than the 90 percent figure?

A. Yes, 80 percent.

Viewed most favorably to support Triangle's position, this testimony is a bare assertion by Mr. Bentley that he believes 90% is fair. The City contends that this dialogue is simply a recounting of previous dialogues with City personnel while in the process of negotiating over price and that it was an expression of opinion with respect to contractual reasonableness and not the market reasonableness of the 90% figure. Even if we assume that the above quoted statement is a statement that Mr. Bentley believed that 90% was fair market value, we find this bare statement insufficient to establish that 90% was a reasonable value. Mr. Bentley was not qualified as an expert nor did he explain the basis for his opinion.

The only competent evidence before the trial court was evidence presented by the City of Phoenix establishing that the 80% equipment rental rate more than reimbursed Triangle for its equipment rental costs. Accordingly, we reverse the judgment of the trial court and find that the 80% rate paid by the City of Phoenix to Triangle is the proper rate of compensation.

### STANDBY CHARGE FOR RIPPER ATTACHMENTS

■ Triangle sought payment from the City for standby time on ripper attach-

ments to bulldozers. A ripper is a tooth-like piece of equipment attached to the rear of a bulldozer. Whenever digging becomes difficult and the ground cannot be moved with the front end of the bulldozer, the ripper is used to loosen the earth. When not being used to loosen the earth, the ripper attachment serves as a counterbalance on the bulldozer. A counterbalance other than a ripper can be attached to a bulldozer. When in actual operation, the rippers involved in the sewer line project were used to remove concrete from the bottom and bank of the river in order to widen and channel the river.

The trial court determined that the City owed Triangle $7,784.00 as standby charge for rippers attached to the bulldozers.

The City argues that the trial court erred because the city's engineer did not approve the use of ripper attachments for most of the work on the sewer line project. It argues that the vast majority of the work done by the bulldozers was in loose, easily moved sand and gravel where ripper attachments were not needed. The City correctly notes that pursuant to the contract, the only equipment available for a standby rate was equipment in operational condition and standing by with the engineer's approval.

However, the record reflects that the project engineer had control over what equipment was on the job site, was aware that rippers were in place on the back of bulldozers and did not object to their presence.

While conceding that its engineer was aware of the ripper attachments, the city contends that this did not establish an implied approval of standby rate for rippers. Instead, it argues that at best its engineer was aware that the rippers were being used as a counterweight for the bulldozers. Since no special accessory rate was payable for a counterweight, the City argues that no accessory rate was payable for the ripper when used as a counterweight. We disagree.

The contract expressly provides for a rental rate for a ripper attachment. It does not specify the purposes for which that attachment must be used. If the engineer did not approve the use of the ripper attachment, it was incumbent upon the engineer to indicate that the attachments were no longer to be used at the job site. Having failed to indicate its disapproval of continued use of the rippers, the City was obligated to pay at the contract rate for such attachments. Had the City expressly informed Triangle that it would no longer pay for ripper attachments at the contract rate and had Triangle nevertheless chosen to utilize the rippers simply as a counterbalance rather than substituting other counterweights, the City would not be liable for the additional payments. However, the record does not reflect that any such communication was made by the City to Triangle. Accordingly, we affirm the trial court's award of $7,784.00 to Triangle for ripper standby time.

## CONCLUSION

In summary, we affirm that portion of the judgment awarding the City of Phoenix $115,633.58 for overpayment for standby time and for other payments which were not raised as issues in this appeal. We reverse that portion of the judgment awarding Triangle 90% of ADOT rental rates for equipment operated in excess of 352 hours. We affirm the judgment awarding Triangle $7,784.00 for ripper standby time and for privilege taxes and overhead and profit applicable thereto. This matter is remanded and the trial court is directed to reduce the amount of its award to Triangle by the amount attributable to the difference between the 90% and 80% rental rate plus privilege taxes and profit attributable to that difference.

Both parties have requested attorney's fees for litigating this appeal. In our discretion, we award attorney's fees to the City of Phoenix following submission of proper documentation to this court.

BROOKS, P.J., and GREER, J., concur.